**Opinion issued January 15, 2019**



In The

# Court of Appeals

For The

# First District of Texas

_____

## NO. 01-18-00673-CV

_____

## IN THE INTEREST OF A. J. H., A CHILD

---

**On Appeal from the 314th District Court**
**Harris County, Texas**
**Trial Court Case No. 2017-00233J**

---

## MEMORANDUM OPINION

The trial court terminated the parental rights of D.G. to his three-year-old son, A.J.H., based on his failure to support the child, (2) constructive abandonment, and (3) failure to comply with a court order that established the actions necessary to obtain return of the child. *See* TEX. FAM. CODE § 161.001(b)(1)(F), (N), (O). The court also found that D.G. failed to raise a

statutory defense to termination based on failure to comply with a court order, and "even if presented" it was not proven by a preponderance of the evidence. *See id.* § 161.001(d). In addition, the trial court found that it was in A.J.H.'s best interest for the Department of Family and Protective Services to be appointed his sole managing conservator. *Id.* § 161.001(b)(2).

D.G. appealed. He raises five issues challenging the legal and factual sufficiency of the evidence to support the trial court's findings of three predicate acts, that termination of his parental rights was in A.J.H.'s best interest, and the appointment of the Department as sole managing conservator.

Because there is legally and factually sufficient evidence to support one predicate act and the best-interest finding, we affirm.

## BACKGROUND

A.J.H. was one-and-a-half years old when he was scalded in a bathtub by his mother's boyfriend. While A.J.H. was in the hospital recovering from his burns, the Department of Family and Protective Services obtained temporary managing conservatorship of him. A.J.H. was placed in foster care.

The mother alleged that D.G. was the biological father of A.J.H. D.G. was living in New Orleans, Louisiana, and he did not know that he was the boy's father or that the mother, with whom he had terminated a relationship many months before A.J.H.'s birth, had ever been pregnant. In late February or early March

2

2017, Micaya Pugh, a Department caseworker, spoke to D.G. on the phone, informing him of the situation that brought A.J.H. into care and that the mother had alleged that he was the father. D.G. requested a DNA test to determine paternity, and he indicated that he wanted custody of A.J.H. if he was established as the father.

In early March 2017, the Department attempted to serve citation on D.G. at an address on Feliciana Street in New Orleans that it had obtained from the mother, but the attempted service was unsuccessful. About two weeks later, and before the DNA test was conducted, the trial court issued a temporary order incorporating the terms of a family service plan. In the order, the court acknowledged that D.G. "although entitled to notice of this hearing, was not served." The court also found that D.G. had not reviewed and did not understand the family service plan and that he had not "been advised that unless he is willing and able to provide the child with a safe environment . . . within the reasonable period of time specified in the plan, his parental and custodial duties and rights may be subject to restriction or to termination." D.G. had not signed the plan.

About two months later, in May 2017, the Department issued citation by publication for one day in the *Daily Court Review*, a daily newspaper circulated in Harris, Montgomery, Galveston, Brazoria, Matagorda, Waller, Chambers, Liberty, and Fort Bend Counties.

In June 2017, a DNA sample collected from D.G. established him as the father of A.J.H. According to a report admitted without objection at trial, Pugh called D.G. in late June 2017 to share the results of the DNA test. D.G. immediately initiated a three-way phone call with his mother and the caseworker. Both D.G. and his mother expressed a desire to obtain custody of A.J.H., and both provided requested contact information to Pugh. The report stated that Pugh "explained the family plan and emailed a copy to him." The report also stated that Pugh also notified D.G. and his mother of the next court date and weekly visitations, but D.G. told Pugh that he wanted to see proof of the DNA test results.

In September 2017, the court held a hearing regarding the paternity of A.J.H., and the Department again unsuccessfully attempted personal service of citation on D.G. in New Orleans. The following month, the trial court entered an order establishing D.G. as the father of A.J.H. D.G. was personally served three months later, on January 26, 2018.

Trial commenced on January 9, 2018, three weeks before D.G. was personally served in New Orleans. Although the court entered a decree terminating the parental rights of both parents, it later granted a new trial as to D.G. The new trial was conducted on June 5, 2018. Among the exhibits admitted at trial was the March 2017 status hearing order, which incorporated the family service plan.

4

The family service plan listed specific tasks assigned to D.G. including: (1) participating in scheduled supervised visitation with A.J.H.; (2) refraining from participating in criminal or illegal activities and notifying his caseworker within five days of release if he were arrested; (3) fully and honestly cooperating with all parties including the caseworker, attorneys, and providers; (4) maintaining monthly telephone contact with his caseworker; (5) providing his caseworker with information regarding his employment, address, phone number, relationship status, and compliance with services within five days of any change; (6) remaining sober and drug free throughout the case; (7) maintaining stable and appropriate housing and income to demonstrate that he can provide for his child; and (8) submitting to a DNA test.

Two witnesses testified at the new trial, caseworker Pugh and D.G. Pugh testified about the incident that brought A.J.H. into the Department's custody. She said that A.J.H. was recovering well from his burns, had no special needs, and remained in an adoptive foster home that was meeting his physical and emotional needs. She also testified that A.J.H. had grown enormously since being placed with his foster family: "He was a shell of himself when he came into care and he has completely blossomed into a very outgoing normal kid."

Pugh said that she had only minimal contact with D.G., talking with him a "couple of times," "off and on throughout the case," although she had tried "to

5

reach out to him multiple times," including emailing him twice to inform him of changes in the trial date. Despite her efforts, Pugh "never had significant contact with the father." However, she testified that she sent the father a family service plan by email around the time she told him about the DNA results in June 2017. She testified that she used an email address that D.G. provided and from which he had responded to an email from her at least once. But, she noted that D.G. never signed and returned the family service, and she did not know if he had received it.

D.G. submitted to DNA testing, but he did not complete the other actions required by the family service plan. Pugh said that he did not provide her "with proof of stable housing, stable income," although she acknowledged that he had told her he was "working as a chef." Pugh testified that D.G did not cooperate with the Department, did not remain in contact with the Department, and never met or visited with A.J.H. Pugh recalled that D.G. "may have told me that he had problem getting down here. I told him to talk to his attorney." Pugh said she was unaware of whether D.G. had maintained a "sober and drug free life." She believed D.G. had a criminal record, but she did not offer any specific facts to support this.

Finally, Pugh testified that it was in A.J.H.'s best interest for his father's parental rights to be terminated because D.G. had never met his son, nor had he sent any money, letters, or gifts. She said that A.J.H. was "in a stable, supportive and loving home that is more than willing to adopt and care for him for the rest of

his life." She said that A.J.H. had been with the foster family for more than a year, and he was bonded to the parents and their other children. She agreed that removing A.J.H. from his foster family would "really devastate" him.

D.G. was 27 years old at the time of trial. He remembered dating A.J.H.'s mother, but he could not recall when they met or when she moved to Texas. He never knew A.J.H.'s mother was pregnant, and when he first learned he might be the father of the child after the Department contacted him in this case, he let the Department know that he wanted to be reunified with his son.

D.G. testified that he never received a service plan from the Department, and he said he had been told that he would be contacted, given a service plan describing what he needed to do, and have a home study. At trial, D.G. was asked about his attempts to contact anyone in connection with this case. He testified that he had replied to an email and contacted his appointed counsel. He also said that he came to Houston twice, arriving at the wrong courthouse building and being redirected. He said he tried to appear at the first hearing, but after it was reset, he was unable to return to Houston from New Orleans.

D.G. admitted that he never visited A.J.H. He also admitted that in July 2017, he was convicted of a crime, for which he spent five days in jail. Records admitted at trial showed that he was charged with assault and resisting arrest, and he pleaded guilty to the misdemeanor offenses of disturbing the peace and resisting

an officer. D.G. also admitted that he used marijuana about "once a week or something," since A.J.H. was born in January 2015.

The trial court found that D.G. had committed three predicate acts: failure to support, constructive abandonment, and failure to comply with a court order. The court also found that D.G. failed to raise a statutory defense to termination based on failure to comply with a court order, and, in any event, did not prove the defense by a preponderance of the evidence. Finally, the trial court found that it was in A.J.H.'s best interest for the Department of Family and Protective Services to be appointed his sole managing conservator. D.G. appealed.

## ANALYSIS

D.G. challenges the termination of his parental rights and the appointment of the Department as sole managing conservator in five issues all of which assert that the evidence was legally and factually insufficient to support the trial court's findings. Specifically, he challenges the predicate-act findings, the best-interest finding, and the managing conservator determination.

## I.     Legal standards regarding parental rights

Protection of the best interests of the child is the primary focus of the termination proceeding in the trial court and our appellate review. *See In re A.V.*, 113 S.W.3d 355, 361 (Tex. 2003). On appeal, because of the fundamental liberty interests at stake, we strictly scrutinize termination proceedings. *See Holick v.*

*Smith*, 685 S.W.2d 18, 20 (Tex. 1985). The decision to terminate parental rights must be supported by clear-and-convincing evidence, which is "the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." TEX. FAM. CODE § 101.007; *see Santosky v. Kramer*, 455 U.S. 745, 769, 102 S. Ct. 1388, 1403 (1982); *In re J.F.C.*, 96 S.W.3d 256, 263–64 (Tex. 2002).

In proceedings to terminate the parent-child relationship, the Department must establish by clear-and-convincing evidence that one or more of the acts or omissions listed in Family Code section 161.001(b)(1) occurred and that termination is in the best interest of the child. TEX. FAM. CODE § 161.001(b). Both elements must be established, and termination may not be based solely on the best interest of the child as determined by the trier of fact. *Tex. Dep't. of Human Servs. v. Boyd*, 727 S.W.2d 531, 533 (Tex. 1987). "Only one predicate finding" under section 161.001(b)(1) "is necessary to support a judgment of termination when there is also a finding that termination is in the child's best interest." *A.V.*, 113 S.W.3d at 362.

## II.    Standards of review

In a legal sufficiency review, we consider "the evidence in the light most favorable to the judgment," meaning that we "must assume that the factfinder resolved disputed facts in favor of its finding if a reasonable factfinder could do

so." *J.F.C.*, 96 S.W.3d at 266. In doing so, we defer to the factfinder's determinations of credibility. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). Evidence is legally sufficient if it is "such that a factfinder could reasonably form a firm belief or conviction about the truth of the matter on which the State bears the burden of proof." *J.F.C.*, 96 S.W.3d at 266; *see* TEX. FAM. CODE § 101.007. "If, after conducting its legal sufficiency review of the record evidence, a court determines that no reasonable factfinder could form a firm belief or conviction that the matter that must be proven is true, then that court must conclude that the evidence is legally insufficient." *J.F.C.*, 96 S.W.3d at 266.

In a factual sufficiency review, we consider the entire record, including evidence both supporting and contradicting the finding. *See id.*; *In re C.H.*, 89 S.W.3d 17, 25–26 (Tex. 2002). "If, in light of the entire record, the disputed evidence that a  reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *J.F.C.*, 96 S.W.3d at 266.

## III.   Failure to comply with a court order

In its final decree of termination, the trial court found that the father had committed three predicate acts: (1) failure to support the child, *see* TEX. FAM. CODE   § 161.001(b)(1)(F);   (2)   constructive   abandonment,   *see*   *id.*

10

§ 161.001(b)(1)(N); and (3) failure to comply with a court order that established the actions necessary to obtain return of the child, without proof of a statutory defense, *see id.* § 161.001(b)(1)(O); *id.* § 161.001(d).

One of the predicate grounds that may justify termination of the parent-child relationship applies when a parent has:

> failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department of Family and Protective Services for not less than nine months as a result of the child's removal from the parent under Chapter 262 for the abuse or neglect of the child.

TEX. FAM. CODE § 161.001(b)(1)(O). This does not require the parent who failed to comply with a court order be the same parent whose abuse or neglect warranted the child's initial removal. *See In re D.R.J.*, 395 S.W.3d 316, 320 (Tex. App.—Fort Worth 2013, no pet.); *In re S.N.*, 287 S.W.3d 183, 187–89 (Tex. App.—Houston [14th Dist.] 2009, no. pet.).

The father does not dispute that A.J.H. was removed to the conservatorship of the Department due to neglectful supervision by his mother, who left A.J.H with the boyfriend who hurt him. The father also does not dispute that the Department was appointed temporary managing conservator of A.J.H. at least nine months before trial. These unchallenged findings are binding on us "unless the contrary is established as a matter of law, or if there is no evidence to support the finding." *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696 (Tex. 1986); *see In re*

*E.C.R.*, 402 S.W.3d 239, 249 (Tex. 2013) (unchallenged findings of fact supported termination under section 161.001(1)(O) because record supported those findings).

During the termination trial, the status hearing order and family service plan were admitted into evidence. The order was dated March 14, 2017. On January 10, 2018, after the court had entered an order establishing D.G. as the father of A.J.H., the court entered another order. This order provided that the "actions specified in each service plan . . . on file as of the date of this order represent actions which this Court requires of the Parent specified in the service plan," for the parent "to regain custody of the child . . . presently in the temporary managing conservatorship of the Department." It further provided that "all previous orders issued by this Court shall continue without modification." This is evidence of the existence of a court order that specifically established the actions necessary for the parent to obtain the return of the child. Thus, the unchallenged findings relevant to subpart (O) are supported by the record. *See McGalliard*, 722 S.W.2d at 696; *E.C.R.*, 402 S.W.3d at 249.

Although the father asserts that the evidence is legally and factually insufficient to support the trial court's findings, he does not raise a factual dispute about his compliance with the plan. At trial he testified that he never met or visited A.J.H., never provided any financial or material support to the child, engaged in criminal activity for which he spent five days in jail, regularly used marijuana, and

did not maintain regular monthly contact with the Department. Instead of raising a factual dispute about his compliance with the plan, he argues that he did not receive the service plan and did not have a reasonable opportunity to comply with it because he was personally served in January 2018 and trial was held in June 2018. These arguments are in the nature of a defense or excuse for his failure to comply with any of the requirements of the plan, with the exception of DNA testing.

## A.    Receipt of the service plan

Pugh testified that she emailed the family service plan to D.G. in June 2017 after she spoke to him by telephone about the results of the DNA test. She testified that D.G. gave her the email address that she used and that he responded to one of her emails from that same email address. A printout of an email string that included a response from D.G. to Pugh was admitted into evidence at trial. D.G. testified that he "never did" get a service plan.

Because the trial court is the sole judge of the witnesses' credibility, the trial court could have believed that Pugh sent the email to D.G. and disbelieved D.G.'s testimony that he did not receive it. *See J.P.B.*, 180 S.W.3d 573 (defer to factfinder's credibility determination); *Interest of L.L.N-P.*, No. 04-18-00380-CV, 2018 WL 6069853, at *2 (Tex. App.—San Antonio Nov. 21, 2018, no pet. h.) (trial court, as factfinder, was entitled to believe testimony of caseworker who said she

13

sent the plan to parent and to disbelieve parent who testified that he never received plan). Accordingly, D.G.'s argument relating to the receipt of the service plan is overruled.

### B.  Reasonable opportunity to comply

D.G. contends that he did not have a reasonable opportunity to comply with the family service plan because he was not personally served until January 2018 and his trial was in June 2018.

The Department may serve citation by publication for a parent who cannot be served personally or by mail. TEX. FAM. CODE § 102.010(a); *see In re E.R.*, 385 S.W.3d 552, 564 (Tex. 2012). Citation by publication is served "as in other civil cases." TEX. FAM. CODE § 102.010(a); TEX. R. CIV. P. 109. "If a parent of the child has not been personally served in a suit in which the Department of Family and Protective Services seeks termination, the department must make a diligent effort to locate that parent." TEX. FAM. CODE § 161.107(b). A lack of diligence makes service by publication ineffective. *See E.R.*, 385 S.W.3d at 564; *Anderson v. Collum*, 514 S.W.2d 230, 231 (Tex. 1974).

The record shows that after unsuccessful attempts to effect personal service on D.G. in Louisiana, the Department served citation by publication on May 5, 2017. *See* TEX. FAM. CODE § 102.010(b) ("Citation by publication shall be published one time."). After May 5, the Department continued to attempt personal

service on D.G. in Louisiana, finally accomplishing service on him in January 2018 at the same address that it had used in its initial attempts at personal service.

Although D.G. was not personally served until January 2018, he does not argue that the court lacked jurisdiction over him. The trial court acquired personal jurisdiction over D.G. in May 2017 when citation issued and was served "in a manner provided by law." *Wilson v. Dunn*, 800 S.W.2d 833, 836 (Tex. 1990); *see* TEX. FAM. CODE § 102.010(a); TEX. R. CIV. P. 109. The fact that the Department also served D.G. personally at his home in Louisiana in January 2018 simply removed the requirement for the court to "inquire into the sufficiency of the diligence exercised in attempting to ascertain the residence or whereabout of the defendant . . . before granting any judgment" on service by publication. TEX. R. CIV. P. 109; *see* TEX. FAM. CODE § 161.107(b); *E.R.*, 385 S.W.3d at 563.

The evidence is undisputed that the Department had direct contact with D.G. as early as February or March 2017, when Pugh contacted him to inform him he had been identified as the father of A.J.H. In June 2017, nearly a year before the termination trial and a month after the trial court obtained jurisdiction of D.G., Pugh informed him that the DNA test results established him as the father. According to records admitted without objection at trial, Pugh also spoke to D.G. about the family service plan during their conversation in June 2017. And at trial, she testified that she sent the family service plan to him at that time. As we have

15

explained, as the sole judge of the credibility of the witnesses, the trial court was entitled to believe Pugh's testimony that the plan was sent to D.G. as early as June 2017, nearly a full year before his trial on June 5, 2018. Accordingly, we conclude that D.G. had a reasonable opportunity to comply with the family service plan. *See In Interest of I.G.*, No. 04-17-00554-CV, 2018 WL 442509, at *3 (Tex. App.—San Antonio Jan. 17, 2018, pet. denied) (mother had reasonable opportunity to comply with family service plan because evidence showed that she was informed of requirements though Department did not provide her with copy of plan).

## C. Defense to termination under subpart (O)

D.G. argues that he did not have a reasonable opportunity to complete the family service plan "through no fault of his own" because the Department "made no effort to set up services" in Louisiana. This argument echoes the statutory defense to termination under subpart (O), but the evidence does not preponderate in favor of the application of the statutory defense.

The Texas Family Code establishes a single affirmative defense to termination for failure to comply with a court order:

> A court may not order termination under Subsection (b)(1)(O) based on the failure by the parent to comply with a specific provision of a court order if a parent proves by a preponderance of evidence that:
>
> > (1) the parent was unable to comply with specific provisions of the court order; and

(2) the parent made a good faith effort to comply with the order and the failure to comply with the order is not attributable to any fault of the parent.

TEX. FAM. CODE § 161.001(d).

D.G. has not established the applicability of this defense. At trial he did not put on evidence that he was unable to comply with the specific provisions of the court order, that he made a good faith effort to comply with the order, and that his failure to comply with it is not attributable to his fault. Accordingly, we conclude that the trial court's findings that D.G. failed to raise and prove the statutory defense was supported by legally and factually sufficient evidence in the record.

\* \* \*

We overrule D.G.'s third issue, and because proof of only one predicate act is required to support termination of parental rights, we do not need to consider his first and second issues, which challenge the evidentiary sufficiency of the trial court's findings on the two other predicate acts. *See* TEX. R. APP. P. 47.1.

## IV. Best interest of the child

In his fourth issue, D.G. asserts that the evidence is legally and factually insufficient to support the trial court's finding that termination of his parental rights is in the best interest of A.J.H. D.G. argues that the Department has not proven that terminating his parental rights is in A.J.H.'s best interest because he wants the opportunity to raise his son, he is willing to do what it takes to raise him,

he has sufficient income and an appropriate home in which to raise his son, and he is willing to perform services required by the Department.

A strong presumption exists that a child's best interests are served by maintaining the parent-child relationship. *See, e.g.*, *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re L.M.*, 104 S.W.3d 642, 647 (Tex. App.—Houston [1st Dist.] 2003, no pet.). In determining whether termination of a father's parental rights was in the child's best interest, we consider several nonexclusive factors, including (1) the child's desires, (2) the current and future physical and emotional needs of the child, (3) the current and future physical danger to the child, (4) the parental abilities of the person seeking custody, (5) whether programs are available to assist the person seeking custody in promoting the best interests of the child, (6) plans for the child by the person seeking custody, (7) stability of the home, (8) acts or omissions of the parent that may indicate that the parent-child relationship is improper, and (9) any excuse for acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976). The Department is not required to prove all of these factors, and the absence of evidence about some factors does not preclude the factfinder from reasonably forming a strong conviction that termination is in the children's best interest. *See C.H.*, 89 S.W.3d at 27. Evidence establishing one of the predicate acts under Section 161.001(b)(1) also may be relevant to determining the best interests of the child. *See id.* at 27–28.

**The child's desires.** A.J.H. was under three years old at the time of trial, and too young to express his desires. "When children are too young to express their desires, the factfinder may consider that the children have bonded with the foster family, are well-cared for by them, and have spent minimal time with a parent." *In re J.D.*, 436 S.W.3d 105, 118 (Tex. App.—Houston [14th Dist.] 2014, no pet.). Pugh's testimony established that A.J.H. was bonded to his foster parents and their children, that he was well-cared for by them, and that he had never even met D.G. This weighs in favor of the trial court's best-interest finding.

**The current and future physical and emotional needs of and physical danger to the child; whether programs are available to assist the person seeking custody in promoting the best interests of the child.** No evidence in the record addresses these factors which therefore play no part in this Court's analysis.

**The parental abilities and plans for the child of the person seeking custody.** There is no evidence in the record about D.G.'s parental abilities or his plans for A.J.H. He testified that he had income and a home, and he introduced a copy of a one-year lease agreement. Conversely, with respect to the foster parents, the evidence demonstrated that they were able to provide a safe and stable home for A.J.H. and that he was thriving and that they wished to adopt him. This evidence supports the trial court's best-interest finding.

19

**The stability of the home.** The evidence showed that D.G. had lived with his mother during part of this case and then obtained a one-year lease on a home. However, though the Department bears the burden to prove that termination is in the child's best interest, there was no evidence about D.G.'s home, its suitability for a child, or whether other people would live in the home. Conversely, the evidence demonstrated that the foster parents who wished to adopt A.J.H. had provided him with a stable home. This evidence is neutral as to the trial court's best-interest finding.

**Acts or omissions of the parent and excuses therefore.** The evidence showed that D.G. failed to complete or participate in his family service plan, engaged in criminal activity that resulted in his incarceration for five days during the pendency of this case, regularly (by his admission) used marijuana, and never met or visited A.J.H. He provided no excuse for his criminal activity, drug use, and failure to visit or meet his son. This evidence supports the trial court's best interest finding.

\* \* \*

Having considered the *Holley* factors and the evidence in this case, we conclude that there is legally and factually sufficient evidence to support the trial court's finding that termination of D.G.'s parental rights is in A.J.H.'s best interest. We overrule D.G.'s fourth issue. Because we have found legally and factually

20

sufficient evidence to support one predicate act and the best-interest finding, we do not need to consider D.G.'s fifth issue, which pertains to the appointment of the Department as sole managing conservator. *See* TEX. R. APP. P. 47.1.

## CONCLUSION

We affirm the trial court's final decree for termination.


Sherry Radack
Chief Justice


Panel consists of Chief Justice Radack, and Justices Higley and Lloyd.